IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**In re: CCA Recordings 2255 Litigation**,
                **Petitioners**,

v.                                               Case No. 19-cv-2491-JAR-JPO

                                                 (This Document Relates to Case No. 13-cr-20070-DDC-4, *United States v. Terry D. Tillman*, and Case No. 19-2083-JAR-JPO, *Terry D. Tillman v. United States*)

**United States of America**.
                **Respondent.**

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Terry Tillman's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. 302).[1] Petitioner alleges the government violated the Sixth Amendment by intentionally and unjustifiably becoming privy to his attorney-client communications, and asks the Court to reject the government's request to dismiss this action on procedural grounds and find that he has made a sufficient showing to warrant an evidentiary hearing. As a remedy, he asks the Court to vacate his judgment with prejudice to refiling or alternatively, to reduce his custodial sentence by 50% and vacate his term of supervised release. The government has responded, opposing the motion and seeking dismissal on several grounds, including on threshold jurisdictional grounds.[2] The Court previously held

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, No. 13-20070-DDC-4. Citations prefaced with "*CCA Rec. Lit.* Doc." Refer to filings and entries in this consolidated case, No. 19-cv-2491-JAR-JPO. With the exception of *United States v. Carter*, Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"), citations to filings in Case No. 16-20032-JAR are prefaced with "*Black*, Doc."

[2] *Tillman v. United States*, No. 19-2083-JAR-JPO, Docs. 3, 7.

1

that in cases where the alleged Sixth Amendment violation occurred after the petitioner entered his guilty plea but before he was sentenced, he lacked standing to challenge his conviction, but not his sentence.³  The Court has reviewed the parties' submissions and the record and is prepared to rule.  For the reasons explained in detail below, the Court denies the government's motion to dismiss on timeliness grounds.  Petitioner's challenge to his sentence, including any term of supervised release, is denied.  Petitioner is also denied a certificate of appealability.

I.      Background

   A.      Procedural History

Petitioner was charged in a multi-defendant Indictment with one count of carjacking, in violation of 18 U.S.C. §§ 2 and 2219.⁴  This count carried a statutory term of no more than 15 years' imprisonment.⁵

On August 12, 2013, Petitioner pleaded guilty to the offense pursuant to a written plea agreement with the government.⁶  In exchange for Petitioner's guilty plea, the government agreed to: (1) jointly request a sentence at the bottom of the advisory Guidelines range; (2) not file additional charges arising out of the facts forming the basis for the Indictment; and (3) not request an upward departure if Petitioner declined to request a downward departure.⁷  While the plea agreement included an appeal and collateral attack waiver, it specifically reserved Petitioner's right to collaterally attack his conviction and sentence based on ineffective assistance of counsel and prosecutorial misconduct.⁸

---

³ *CCA Rec. Lit.*, Docs. 730, 784.

⁴ Doc. 1.

⁵ *Id.*; *see* 18 U.S.C. § 2119(1).

⁶ Doc. 69.

⁷ *Id.* ¶ 5.

⁸ *Id.* ¶ 12.

Based on a total offense level of 26 and a criminal history category of VI, the Presentence Investigation Report ("PSR") calculated Petitioner's Guidelines range at 120 to 150 months.[9] The government did not file any objections to the PSR or a sentencing memorandum prior to the sentencing hearing.[10]  Petitioner did file a sentencing memorandum, urging the court to impose a sentence at the bottom of the advisory Guidelines range.[11]  On November 12, 2013, Judge Carlos Murguia adopted the PSR's sentencing calculations and found that the Guidelines range was 120 to 150 months' imprisonment.[12]  Petitioner and the government jointly requested a 120-month sentence.[13]  The Court sentenced Petitioner to 120 months' imprisonment, followed by a three-year term of supervised release.[14]  Petitioner did not file a direct appeal, nor has he filed a prior habeas motion under 28 U.S.C. § 2255.

Petitioner was represented by Jeremy Weis in the underlying criminal proceedings.  The Court appointed the Federal Public Defender ("FPD") to represent Petitioner in his § 2255 proceedings on July 17, 2018.[15]  On February 13, 2019, the FPD filed this § 2255 motion on Petitioner's behalf, setting forth a single ground for relief: the government violated the Sixth Amendment by intentionally and unjustifiably intruding into his attorney-client relationship.  Petitioner's custodial sentence is expected to end on May 10, 2022.[16]

---

[9] Doc. 98 ¶ 95.

[10] *Id.* ¶ 118.

[11] Doc. 105.

[12] Doc. 332 at 5.  Following Judge Murguia's resignation, the underlying criminal case was reassigned to Judge Daniel D. Crabtree.  Doc. 327.

[13] Doc. 332 at 6.

[14] Doc. 109.

[15] Standing Order 18-3.

[16] Fed. Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited Jan. 20, 2022).

B.     The *Black* Investigation and Order

The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black* Order*"*) that precipitates the § 2255 motion before the Court.[17]  That comprehensive opinion was intended to provide a record for future consideration of the many anticipated motions filed pursuant to § 2255 and is incorporated by reference herein.  The Court does not restate the underlying facts and conclusions of law in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

Petitioner seeks relief based on events documented in the *Black* case and investigation, which involved audio recordings of telephone conversations and soundless video recordings of meetings between attorneys and their clients who were detained at CCA.  The government admits that it obtained videos from CCA in connection with the *Black* case, which focused on drug and contraband trafficking inside CCA.  The government's possession of these recordings came to light in August 2016, when then-Special Assistant United States Attorney ("SAUSA") Erin Tomasic and Assistant United States Attorney ("AUSA") Kim Flannigan accused defense attorney Jacquelyn Rokusek of "jeopardiz[ing] their investigation" in *Black* based on information they claimed to have gleaned from the video recordings.[18]  The defense also discovered that the United States Attorney's Office for the District of Kansas ("USAO") had a practice of routinely obtaining CCA recorded attorney-client phone calls from CCA, and that it did so without notice to attorneys, clients, or courts.[19]

---

[17] Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019).  As discussed in that Order, the Sixth Amendment claims stem from recordings of conversations and meetings with counsel while petitioners were detained at Corrections Corporation of America ("CCA").  That facility has since been renamed CoreCivic.  For convenience, the Court refers to it as CCA in this Order.

[18] *Id.* at 70–80.

[19] *Id.* at 29–30.

Once notified of the video and audio recordings, this Court ordered (1) all local federal detention facilities to cease recording attorney-client meetings and phone calls;[20] (2) the video and audio recordings in USAO custody to be impounded;[21] and (3) the government to preserve its computer hard drives.[22] By October 11, 2016, the Court had appointed a Special Master to assist in what the Court termed "Phase I and Phase II" of the Court's investigation, that is, to determine the number of recordings possessed by the government, to index and segregate them, and to identify privileged or confidential information within those recordings.[23]

The government did not cooperate with the Special Master's investigation, however, which ultimately resulted in a lengthy delay in this Court's ability to rule on these issues. Finally, despite the delay associated with the government's failure to cooperate and its litigation efforts challenging the propriety of the Special Master's investigation, the Court conducted a full evidentiary hearing on all pending matters in *Black* in October and November 2018.

On August 13, 2019, the Court issued the *Black* Order. As detailed in the Order, the *Black* investigation revealed in relevant part that CCA recorded some of the outgoing phone calls between detainees and their counsel using equipment provided by Securus Technologies, Inc. ("Securus").[24] The Court discussed the flaws in CCA's privatization procedures and noted that as a result of these flaws, "calls between defense attorneys and clients at CCA were routinely

---

[20] *Black*, Doc. 253 at 3.

[21] *Id.* at 3, 12 ("The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.").

[22] *Id.* at 40. At the September 7, 2016 hearing in *Black*, "[t]he Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives." *Id.*

[23] *Black*, Doc. 146 (Appointment Order).

[24] *Black* Order at 5, 80, 85.

recorded even when the attorney properly requested privatization."[25] The Court further detailed how prosecutors at the Kansas City Office of the USAO not only knew that CCA recorded such calls, but that they could obtain the resulting recordings by making "a general request for detainee calls."[26] The Court found that the government routinely made requests for detainee calls—without taking any precautionary measures to avoid protected communications—and routinely received recordings of attorney-client calls as a result.[27] The USAO also used a grand jury subpoena to obtain recorded detainee calls associated with approximately 40 detainees as part of the *Black* investigation.[28]

The *Black* Order further discussed, among other things, the government's view that the audio recordings are not protected communications because detainees at CCA signed a general waiver and consent to the recording and monitoring of their calls.[29] The Order also addressed the governing standard for an intentional-intrusion Sixth Amendment claim in the Tenth Circuit.[30] The Order discussed the elements required to prove a per se violation of the Sixth Amendment under the Tenth Circuit's decision in *Shillinger v. Haworth*,[31] which held that a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its

---

[25] *Id.* at 80–88.
[26] *Id.* at 106.
[27] *Id.* at 101–06.
[28] *Id.* at 90–91.
[29] *Id.* at 166–76.
[30] *Id.* at 145–62.
[31] 70 F.3d 1132 (10th Cir. 1995).

intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest.[32] Once those elements are established, prejudice is presumed.[33]

The Court further held that a finding of purposeful intrusion into the attorney-client relationship necessarily requires a threshold showing that the recordings were protected attorney-client communications.[34] While recognizing that the attorney-client privilege is not a right guaranteed by the Sixth Amendment, the Court applied principles relating to the privilege as a framework for this showing that the recordings between petitioners and counsel were protected communications under the Sixth Amendment. With respect to the audio recordings, the Court determined that the following threshold showings must be made after review and verification by the FPD: (1) the telephone recording exists; and (2) a given call contains protected attorney-client communication, i.e., communication that relates to legal advice or strategy sought by the client.[35] This threshold showing requires an affidavit from defense counsel confirming that the nature and purpose of the call(s) were within the ambit of protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery.[36]

### C. Proceedings in Consolidated Master Case

The *Black* Order reassigned all *Black*-related § 2255 motions pending before other judges in the District to the undersigned for determination of the merits of petitioners' Sixth Amendment claims and for consolidated discovery.[37] It was this Court's intent that by

---

[32] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[33] *Id.*

[34] *Id.* at 163.

[35] *Id.* at 166.

[36] *Id.*

[37] *CCA Rec. Lit.*, Doc. 1.

reassigning the habeas actions to the undersigned and consolidating the cases for discovery, the process for seeing over 100 cases to completion would be streamlined for all parties.

Like the *Black* Order, the Court assumes the reader is familiar with the proceedings in the consolidated master case that precipitate the matter before the Court, and does not restate the underlying facts in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it. As detailed in the Court's October 15, 2020 Orders, the parties' initial efforts at cooperation culminated in the government's notice that it refuses to comply with discovery orders and demands that the Court rule immediately on both the procedural and merits defenses raised in its responses to the § 2255 motions.[38] Highly summarized, the Court: (1) reaffirmed its previous ruling on the government's implied waiver argument and, in light of the government's blanket objections to petitioners' privilege logs, established a procedure for *in camera* review of the recordings; (2) ordered petitioners asserting audio-recording claims to supplement the record with affidavits on the issue of waiver; (3) ordered the parties to supplement their responses and replies to address jurisdictional defenses and the collateral-attack waiver by plea agreement issue; and (4) found the government's refusal to comply with discovery orders issued by the Court sanctionable under Fed. R. Civ. P. 37(b)(2) and notified the government of its intent to take as conclusively established certain facts petitioners might have proved regarding the "privy to" element of their Sixth Amendment claims for any petitioner who establishes that he or she is entitled to an evidentiary hearing.[39]

---

[38] *CCA Rec. Lit.*, Docs. 587, 588.

[39] *Id.* The Court subsequently denied petitioners' related Motion for Spoliation Sanctions under Fed. R. Civ. P. 37(e)(2) alleging that the government destroyed or lost ESI relative to the video recordings. *CCA Rec. Lit.*, Doc. 926.

On January 18, 2021, the Court issued an order: (1) reaffirming and expanding its holding regarding the applicable Sixth Amendment standard; (2) addressing the collateral-waiver by plea issue; and (3) addressing jurisdictional defenses raised by the government, including certification requirements under Rule 2(b) of the Rules Governing Section 2255 Proceedings.[40]  Specifically, the Court ruled that three petitioners in this consolidated litigation who proceeded to trial in their underlying criminal proceedings are entitled to evidentiary hearings on their audio recording Sixth Amendment claims.   Second, the Court determined that the rule in *Tollett v. Henderson* procedurally barred petitioners who alleged pre-plea Sixth Amendment violations from advancing those claims.[41]  The Court dismissed one petitioner's § 2255 motion on these grounds and certified the issue for appeal; thirty-nine petitioners have successfully moved the Court to stay dismissal of their claims pending the appeal of that case.[42]  Third, the Court determined that approximately twenty petitioners lacked standing to advance their Sixth Amendment claims for various reasons, including: claims that alleged post-sentencing violations; claims where petitioners who had been deported challenged only their sentence; claims where petitioners challenging their sentence had been sentenced to the mandatory-minimum sentence; and claims involving binding pleas that were accepted by the court at the change-of-plea-hearing.[43]

Petitioner timely filed his Rule 2(b) certification on February 25, 2021.[44]

---

[40] *CCA Rec. Lit.*, Doc. 730 (clarified and reconsidered in part on other grounds, *id.*, Doc. 784).

[41] *Id.* (citing 411 U.S. 258 (1973)).

[42] *CCA Rec. Lit.*, Docs. 874, 922.

[43] *CCA Rec. Lit.*, Docs. 730, 784.

[44] *CCA Rec. Lit.*, Doc. 775-1.

On December 10, 2021, the Court issued an order that concluded petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule.[45]

### D. Recordings in This Case

Upon arriving at CCA, Petitioner signed several documents acknowledging that telephone calls that he made from CCA may be monitored and recorded and advising him that calls with his attorney were subject to being monitored unless he followed the privatization procedure in place to make an unmonitored call.[46] While Petitioner was detained at CCA, he called his attorney to discuss his case.

Per the parties' agreement, as part of the *Black* investigation, the government began surrendering recordings and derivative evidence of audio calls from CCA that were in its possession.[47] The government produced the recordings of the calls in Petitioner's case to the Court on January 7, 2019, and copies were provided to the FPD on January 9, 2019.[48] The FPD reviewed two audio recordings of Petitioner speaking with Weis from CCA on September 6 and October 1, 2013.[49]

Pursuant to the Court's Order, Petitioner provided a privilege log detailing the claimed protected communications, verifying that during these calls, Petitioner discussed matters "relat[ing] to legal advice or strategy" with Weis.[50] Petitioner also provided a sworn declaration from Weis,stating that any conversation with an incarcerated client was "related to their case

---

[45] *CCA Rec. Lit.*, Doc. 1034.

[46] *Tillman*, 19-2083-JAR-JPO, Doc. 3-4.

[47] *Black*, Doc. 705.

[48] *Id.*, Doc. 806-3 at 9.

[49] *CCA Rec. Lit.*, Doc. 205-2 at 209–210.

[50] *Id.*

and my representation;" and (2) he knew calls could be recorded for security purposes, that his partner had faxed a request to privatize the firm's number to CCA years before this litigation, and that he did not believe such recordings would be dispensed to prosecutors.[51]

Pursuant to the Court's Order, Petitioner supplemented the record with a sworn statement addressing the issue of waiver with respect to his audio-recordings claim.[52] He avers that he did not understand that by signing the Inmate Handbook and Call Monitoring Sheet, he was consenting to the monitoring and/or recording of his attorney-client calls unless he took certain steps, or that he was consenting to CCA giving the recordings to the USAO and its agents. Petitioner further avers that at the time he placed the calls listed on the privilege log, he did not believe that the recorded preamble applied to attorney-client calls, that the written warning signs placed on or near the telephone applied to attorney-client calls, that his attorney-client calls were subject to monitoring or recording, or that the USAO or its agents could obtain recordings of his attorney-client calls from CCA.

Petitioner was prosecuted by former SAUSA Tomasic and AUSA Trent Krug. Krug denies that he listened to the recordings during the pending underlying case.[53] After sentencing, AUSA David Zabel assisted on the case, and he also denies listening to any audio recordings of calls between Petitioner and counsel.[54]

During the course of Petitioner's prosecution, Tomasic requested audio recordings of his calls while he was incarcerated at CCA.[55] Krug states that Tomasic prepared a request form to

---

[51] *Tillman*, 19-2083-JAR-JPO, Doc. 6-1.

[52] *Id.*, Doc. 5-1.

[53] *Id.*, Doc. 3-1.

[54] *Id.*, Doc. 3-2.

[55] *Id.*, Doc. 3-1.

the U.S. Marshals dated January 6, 2014, which listed the dates of requested recordings for the five co-defendants in this case.[56] That form had the notation: "Attorney/Client conversations will not be included in these recordings."[57] CDs of recorded calls received by the government were sent to defense counsel on January 7, 2014, including Petitioner's calls from "6-6-13 to present [January 6, 2014]."[58] Neither the call-request form nor the Securus call access logs the FPD provided in discovery are included in the record before the Court.[59]

After the government objected to Petitioner's privilege log, the Court reviewed the audio recordings *in camera*. At the beginning of each call, a recorded preamble states the balance of Petitioner's pre-paid call account and the following language: "This is a collect call from an inmate at CCA-Leavenworth Detention Center. This call is subject to recording and monitoring." There is no discussion of this preamble between Petitioner and Weis in either of the calls listed in the privilege log, nor any statements acknowledging the warning or evincing awareness that the calls were being recorded during their conversations. As set out in the privilege log, the calls include discussions relating to legal advice or strategy, including whether Petitioner could or should take action with respect to his plea agreement, perceived problems with the PSR, and whether he should challenge the PSR and why. In light of the analysis below, the Court does not reach the issue of whether Petitioner waived the attorney-client privilege and/or his Sixth Amendment rights with respect to these calls.

---

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *See CCA Rec. Lit.*, Doc. 785 (supplementing the record of several petitioners asserting audio-recording claims with Securus call access logs that show when the calls at issue were "accessed").

## II. Discussion

### A. Timeliness

The government moves to dismiss Petitioner's § 2255 motion as untimely. "Section 2255(f) establishes a one-year limitations period for filing a § 2255 motion. The limitations period commences on the latest of four dates."[60] Petitioner relies upon subsection § 2255(f)(4), "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." This subsection "is an example of what are called 'discovery rules' for delaying the accrual of a cause of action."[61] The Tenth Circuit has explained that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") rule differs from most discovery rules in one respect: "[t]he typical provision starts the limitations period either (1) when the plaintiff has actually discovered the pertinent facts or (2) when a person exercising reasonable diligence would have discovered those facts. The AEDPA provision contains only the second test, an objective standard."[62] "The exercise of reasonable diligence is an ongoing process. What is required at any particular time depends on what one has notice of at that time."[63] "It is irrelevant whether that information has come to the defendant's attention by serendipity or diligence."[64] "The question is whether the defendant acted with reasonable diligence after the information was acquired. And once the defendant could have discovered the pertinent facts, the § 2255 motion must be filed within one year."[65]

---

[60] *United States v. Denny*, 694 F.3d 1185, 1188 (10th Cir. 2012).

[61] *Id.* at 1189.

[62] *Id.* (citations omitted)

[63] *Id.* at 1190.

[64] *Id.*

[65] *Id.* (footnote omitted).

In this case, Petitioner filed his § 2255 motion on February 13, 2019. His motion is therefore timely under § 2254(f)(4) unless "the facts supporting" his intentional-intrusion claim "could have been discovered through the exercise of due diligence" on or before February 12, 2018.[66] The government contends that Petitioner could have discovered the facts pertinent to his claim on January 7, 2014, when Weis was provided the calls during discovery in the underlying criminal case.

In support of its untimeliness argument, the government cites *Johnson v. United States*, where the issue before the Supreme Court was whether a state-court order that vacates a petitioner's prior state-court conviction at the petitioner's request constitutes a "fact"—as opposed to a legal proposition—for purposes of § 2254(f)(4).[67] The Court addressed "the question of how to implement the statutory mandate that a petitioner act with due diligence in discovering the crucial fact of the vacatur order that he himself seeks," concluding that any due diligence is shown by prompt action by the petitioner in seeking the state vacatur order,[68] an event within the petitioner's control. Thus, the Court held that an order vacating a petitioner's state conviction is a fact for purposes of § 2255(f)(4), but the one-year "period begins when a petitioner receives notice of the order vacating the prior conviction, provided that he has sought it with due diligence in state court."[69]

By contrast, the Court agrees that Petitioner had no such element of control over when or if the facts that form the basis of his Sixth Amendment claim occurred. Instead, he must show

---

[66] 28 U.S.C. § 2254(f)(4); *see United States v. Hurst*, 322 F.3d 1256, 1260–62 (10th Cir. 2003) (explaining that "the day of the act" that triggers the clock is not included in the § 2255(f) calculation; holding that "the one-year period of limitations applicable to [petitioner's] § 2255 motion commenced" the day following the date his conviction becomes final (quoting Fed. R. Civ. P. 6(a))).

[67] 544 U.S. 295, 301–02 (2005).

[68] *Id.* at 308–09.

[69] *Id.* at 298.

that "a person exercising reasonable diligence would [not] have discovered" the facts supporting his claim more than one year before that claim was filed.[70] Here, it is not apparent that Petitioner would or even could have discovered the facts needed to support his audio-recording claim within one year after discovery was provided in the underlying criminal case. The Court agrees that the due-diligence standard did not require Petitioner or counsel to search the government's production for the attorney-client calls at issue, especially under these circumstances where the calls were disseminated nearly two months after Petitioner was sentenced and his time for filing a notice of appeal had passed. Moreover, in a February 12, 2019 affidavit, Weis attested that he does not recall ever receiving recorded attorney-client calls in discovery,[71] nor does the government allege that it advised him about such calls in this case. Thus, Petitioner could not have reasonably discovered that the government possessed his attorney-client calls and that the content of those calls was protected and/or privileged until the FPD obtained access to those calls in January 2019 when they were disgorged to the Court.

Further, even assuming that Petitioner had some reason to suspect the government had not only possessed the recording of his attorney-client calls but also became privy to their contents, this suspicion would have been insufficient to trigger any obligation to assert a Sixth Amendment claim. Instead, "due in large part to the government's strategy of delay, denial, and deflection in the *Black* case and its handling of attorney-client recordings,"[72] it was not until at least the October 2018 evidentiary hearing that evidence supporting the privy-to element of

---

[70] *United States v. Denny*, 694 F.3d 1185, 1189 (10th Cir. 2012).

[71] *Tillman*, 19-2083-JAR-JPO, Doc. 4-1.

[72] *United States v. Phommaseng*, No. 15-20020-JAR, 2019 WL 3801720, at *8 (D. Kan. Aug. 13, 2019) (ruling that "[t]he existence and scope of potential Sixth Amendment claims was not certain until January 2019 for [the petitioner's] audio recordings claim" because it was not until then that the government admitted to obtaining the petitioner's recorded attorney-client calls).

15

Petitioner's claim came to light.  Because Petitioner filed his § 2255 motion within one year after both the October 2018 evidentiary hearings and the January 2019 disgorgement of the calls, his February 13, 2019 § 2255 motion is timely under § 2255(f)(4).

### B. Decision in Consolidated Proceedings

The Court entered a Memorandum and Order on December 10, 2021, that concluded petitioners in the temporal category of claims who alleged Sixth Amendment violations that occurred post-plea or conviction but before sentencing could not rely on *Shillinger*'s per se rule, which is incorporated by reference herein.[73]

As discussed in detail in that Order, the Tenth Circuit has recognized that a per se *Shillinger* violation constitutes a narrow variety of presumptively prejudicial constitutional error where the government's unjustified purposeful intrusion into a defendant's attorney-client relationship precludes application of the harmless-error standard and requires automatic relief.[74] The Court went on to conclude, however, that the categorical extension of *Shillinger*'s per se rule to violations that occurred post-plea or conviction but prior to sentencing would amount to an overapplication of that ruling beyond the rationale contemplated and described by the Tenth Circuit.[75]  Accordingly, the Court declined to extend *Shillinger*'s per se rule to an alleged pre-sentence Sixth Amendment violation and prejudice is not to be presumed in this category of claims.[76]  Instead, petitioners must demonstrate prejudice, that is, "a realistic possibility of injury to [the defendant] or benefit to the [government]."[77]

---

[73] *CCA Rec. Lit.*, Doc. 1034.

[74] *Id.* at 14.

[75] *Id*. at 20–21.

[76] *Id.* at 21.

[77] *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)).

16

**C.    Application**

Petitioner's claim is in the temporal category of motions alleging post-plea/pre-sentencing Sixth Amendment violations.  Petitioner falls in a sub-category of these claims involving a non-binding plea agreement where the prosecution agreed to recommend a sentence at the low end of the applicable Guidelines range.  The recorded calls between Petitioner and Weis were made on September 6 and October 1, 2013, after he entered a guilty plea on August 12, 2013, and before he was sentenced on November 12, 2013.  Although the USAO disseminated the recordings in discovery on January 7, 2014, it does not argue that Petitioner lacks standing to challenge his sentence because Tomasic first obtained or had access to the calls after Petitioner was sentenced on November 12, 2013.[78]  Rather, it argues that Petitioner lacks standing to challenge his conviction because the recordings were first accessed after his guilty plea but before sentencing.[79]  Thus, the Court proceeds to analyze Petitioner's claim as a post-plea, pre-sentence violation.

As this Court discussed in its January 18, 2021 Order, when the alleged intrusion occurs after the petitioner entered a guilty plea, it eliminates the possibility that the intrusion could have tainted the petitioner's conviction.[80]  Thus, Petitioner does not have standing to challenge his guilty plea under § 2255.[81]  The only tainted proceeding could be sentencing.  Having determined this category of governmental-intrusion claims may not rely on the *Shillinger* presumption of prejudice, the Court turns to whether Petitioner has demonstrated a realistic

---

[78] *See CCA Rec. Lit.*, Doc. 603-1 (supplemental briefing addressing jurisdiction and challenging standing to bring certain petitioners' conviction and sentencing challenges); Doc. 785 (motion to supplement with Securus call access logs).

[79] *CCA Rec. Lit.*, Doc. 312 at 2–3, 31–32.

[80] *CCA Rec. Lit.*, Doc. 730 at 54.

[81] *Id.*

possibility of injury or benefit to the government. Even assuming Petitioner has satisfied the other elements of his Sixth Amendment claim, Petitioner cannot show any realistic possibility that he was prejudiced as a result of the government's alleged intrusion.

Petitioner entered into a written plea agreement and was sentenced consistent with that agreement. The government's discretion or capacity to prejudice Petitioner was curtailed by the specific terms of the plea agreement. Neither the government nor Petitioner raised any objections to the PSR, the government did not file any motions regarding Petitioner's sentencing, and the 120-month jointly-recommended sentence was the low end of the Guidelines range of 120 to 150 months, as contemplated by the plea agreement. The only governmental conduct that had any effect on sentencing was its offer of a plea agreement that resulted in a sentence at the low end of Petitioner's Guidelines sentence as calculated in the PSR and adopted by the court. Petitioner has not demonstrated, nor can the Court imagine, any realistic possibility of prejudice under these circumstances.

Because Petitioner has not shown and cannot show a realistic possibility of prejudice as a result of the government's alleged intrusion into his attorney-client relationship, and nothing in the record suggests any threat to the reliability or fairness of Petitioner's sentencing proceedings, he cannot succeed on his Sixth Amendment claim. Petitioner's § 2255 motion is denied.

### III. Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant. "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[82] To satisfy this standard, the movant

---

[82] 28 U.S.C. § 2253(c)(2).

must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[83]  For the reasons stated above, the Court finds that Petitioner has not made this showing and, therefore, denies a certificate of appealability as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Terry D. Tillman's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. 2255 (Doc. 302) is **denied** without an evidentiary hearing.  Petitioner is also denied a certificate of appealability.

**IT IS SO ORDERED.**

Dated: <u>January 31, 2022</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[83] *Saiz v. Ortiz*, 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke*, 542 U.S. 274, 282 (2004)).